# In the United States Court of Federal Claims

No. 21-1138C
(Filed Under Seal:  June 25, 2021)
(Reissued for Publication:  July 26, 2021)[*]

*****************************************

| | |
|---|---|
| SAGAM SECURITE SENEGAL, | * |
| | * Preaward Bid Protest; Challenge to |
| Plaintiff, | * Cancellation of Solicitation and |
| | * Resolicitation; Mootness; Cross-Motions for |
| v. | * Judgment on the Administrative Record; |
| | * Improper Disclosure of Protestor's Proposal |
| THE UNITED STATES, | * Information to Competitor; Prejudice; |
| | * Permanent Injunction |
| Defendant. | * |

*****************************************

<u>Thomas A. Coulter</u>, Washington, DC, for plaintiff.

<u>James W. Poirier</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

In this preaward bid protest, plaintiff SAGAM Sécurité Senegal ("SAGAM") challenges the cancellation of a solicitation by the United States Department of State ("State" or "agency"). Specifically, SAGAM alleges that State improperly disclosed portions of SAGAM's proposal to Torres-SAS Security LLC Joint Venture ("Torres") and then erred when it cancelled the solicitation. According to SAGAM, the appropriate remedy for the agency's improper disclosure was to disqualify Torres from the competition for the contract requirement. Before the court are the parties' cross-motions for judgment on the administrative record, as well as defendant's motion to dismiss one count of SAGAM's complaint as moot. As explained below, the court grants defendant's motion for partial dismissal, grants SAGAM's motion for judgment on the administrative record, denies defendant's cross-motion for judgment on the administrative record, and enters a permanent injunction.

## I. BACKGROUND

### A. The Competition Resulting in an Award to Torres

---

[*]  The court initially issued this Opinion and Order under seal with instructions for the parties to propose any redactions.  The parties informed the court that no redactions were necessary to the Opinion and Order.

For approximately thirty-five years, SAGAM has been providing local guard services to the United States embassy in Dakar, Senegal.  Compl. ¶ 5.  State issued Solicitation No. 19AQMM18R0332 for the continuation of these services on April 19, 2019, and amended the solicitation three times.  Administrative R. ("AR") 1-438.  The awardee would perform contract services for a base year, with the possibility of extending performance for four option years.  Id. at 329.  Proposals were due on July 15, 2019.  Id. at 412.  Award would be made to the "Lowest Price Technically Acceptable" proposal.  Id. at 432.

Three offerors submitted proposals:  SAGAM, Torres, and SAKOM Services WI LLC ("SAKOM").  Id. at 1433.  None of the proposals was acceptable to State as submitted.  Id. at 1434, 1437, 1439.  Although the agency believed that both SAGAM and Torres could render their proposals acceptable through discussions, SAKOM's proposal was eliminated from the competitive range.  Id. at 1441-42.  State sent round-one discussion letters to SAGAM and Torres on August 23, 2019.  Id. at 1444-51.  Proposal revisions were sent to the agency on August 30, 2019.  Id. at 1452-1980.  Once the revised proposals were evaluated, both SAGAM and Torres were deemed to have submitted acceptable proposals.  Id. at 2014.

State then initiated round-two discussions with both offerors.  Id. at 2016-21.  It sent discussion letters on December 3, 2019, requesting further information and a "best and final offer" from each offeror by December 13, 2019.  Id. at 2016, 2021.  Of primary relevance to this protest, State included a number of very specific items in its round-two discussion letter with Torres that disclosed specific elements of SAGAM's proposal.  Id. at 2018-21.  The round-two discussion letter sent to Torres was markedly more detailed and comprehensive than the brief discussion letter sent to SAGAM.  Compare id. at 2016, with id. at 2018-21.

Once State received the final, revised proposals sent by SAGAM and Torres, it chose Torres as the awardee because of Torres's lower price.  Id. at 2345-46.  The agency notified SAGAM on March 10, 2020, that Torres had been selected for award, and disclosed Torres's overall price as part of its debriefing of SAGAM on March 12, 2020.  Id. at 2350-53.  The cost savings to State for awarding the contract to Torres rather than to SAGAM, based on the evaluated prices of the offerors, was approximately twenty-two percent.  Id. at 2352.

### B. The First Corrective Action Taken by State

On March 17, 2020, SAGAM lodged a protest at the Government Accountability Office ("GAO") to challenge the agency's award decision.  Id. at 2354-72, 2421-2574.  Of relevance here, SAGAM alleged that Torres's employee compensation plan was not technically acceptable because Torres's price was "unreasonable and unrealistic."  Id. at 2356.  On April 8, 2020, State filed a "Notice of Corrective Action," informing the GAO that the agency would "evaluat[e] the offerors' compensation plans; [and] if necessary, conduct[] discussions and evaluat[e] final proposal revisions; and, mak[e] a new award decision."  Id. at 2376.  In consequence, the GAO dismissed the protest as academic on April 14, 2020.  Id. at 2378.

There is no documentation in the record as to State's corrective action between April 14, 2020, and November 18, 2020, when an internal memorandum was circulated by the contracting

officer ("CO") on the topic of a "possible Procurement Integrity Act violation" in this procurement.[1]  Id. at 2385.  Therein, the CO acknowledged that she "took information from SAGAM's compensation plan to request additional clarifications regarding [Torres's] compensation plan."  Id.  The CO also concluded that the disclosure caused an "impact on the procurement," a view that was shared by the contracting hierarchy at State.  Id. at 2386-87.  At the conclusion of the CO's memorandum, a box was checked to indicate that the agency's Head of Contracting Activity ("HCA") concurred with her assessment that a procurement integrity violation had an impact on the procurement, and further stated that "the contacting officer must cancel the solicitation."  Id. at 2387.

### C.  The Second Corrective Action Taken by State

On December 2, 2020, State emailed SAGAM a "Notice of Solicitation Cancellation." Id. at 2390.  As part of that notice, the agency stated that the "solicitation [wa]s being cancelled following a determination by the Department of State HCA that the Department violated the [PIA] and that the violation impacted the procurement."  Id.  The agency also announced its intention to issue a new solicitation "in the near future."  Id.  SAGAM was invited to compete, once again, for the contract requirement.  Id.  Although SAGAM attempted to protest the cancellation of the solicitation at the GAO, the GAO dismissed the protest as untimely.  Id. at 2417-20.  The GAO's decision issued on March 22, 2021.  Id.

### D.  This Protest

On March 30, 2021, SAGAM filed a protest in this court challenging the cancellation of the solicitation by State.  Although there are a number of grounds stated in SAGAM's complaint, the principal contention advanced by SAGAM is that State's cancellation decision was arbitrary and capricious.  Compl. ¶¶ 11, 32-44.  Defendant argues that the cancellation decision was lawful and not arbitrary, and that SAGAM's protest ground related to the impropriety of the contract award to Torres, later rescinded by State, is moot.  At the conclusion of briefing, the court held oral argument on June 24, 2021.  This matter is now ripe for a ruling.

## II.  DISCUSSION

### A.  Bid Protest Standard of Review

Defendant seeks the dismissal of Count II of the complaint on mootness grounds. Mootness is a threshold jurisdictional issue.  Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002).  "When, during the course of litigation, it develops that . . . the questions originally in controversy between the parties are no longer at issue, the case should generally be dismissed."  Chapman L. Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 939 (Fed. Cir. 2007).  To the extent that a bid protest ground challenges a course of action that the agency has already abandoned, that protest ground is moot and must be dismissed.  See, e.g., Peraton Inc. v. United States, 146 Fed. Cl. 94, 101 (2019) (dismissing as moot a challenge

---

[1]  The statutory provisions commonly known as the Procurement Integrity Act ("PIA") are codified at 41 U.S.C. §§ 2101-2107.

to an initial corrective action that was superseded by a revised corrective action).

SAGAM and defendant have also filed cross-motions for judgment on the administrative record.  In ruling on such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the record." Bannum, 404 F.3d at 1356.

The court reviews challenged agency conduct pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4).  Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)); accord Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286-87 (Fed. Cir. 2010) (providing that a protestor has the "burden of showing that the agency's decision . . . is so plainly unjustified as to lack a rational basis"); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (stating that the arbitrary and capricious standard "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors").  Examples of arbitrary and capricious actions include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Procurement officials "'are entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." Impresa, 238 F.3d at 1332 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the court's review of a procuring agency's decision is "highly deferential." Advanced Data Concepts, 216 F.3d at 1058; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency.").  Furthermore,

in a challenge to a negotiated procurement, the "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

In addition to showing "a significant error in the procurement process," a protestor must show "that the error prejudiced it." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); accord Bannum, 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct"). "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." Banknote, 365 F.3d at 1351 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract."). The test for establishing prejudice "is more lenient than showing actual causation, that is, showing that but for the errors [the protestor] would have won the contract." Bannum, 404 F.3d at 1358.

## B. Analysis

As a threshold matter, defendant's motion for partial dismissal of the complaint is quickly resolved; indeed, SAGAM did not respond to defendant's mootness argument in its response brief. The contract award to Torres is no longer a live issue in this protest. Even if the agency conducted improper discussions with Torres in an attempt "to steer an award to Torres," as alleged in Count II of the complaint, Compl. 16, the award to Torres in March 2020 has been rescinded–rendering this protest ground moot.[2] Defendant's motion to dismiss Count II of the complaint is granted.

Turning to the merits of this protest, SAGAM challenges the rationality of the second corrective action taken by State–the cancellation of the solicitation with intent to issue a new solicitation. In SAGAM's view, State's only rational course of action, once the PIA violation was uncovered by the agency's legal staff, was to disqualify Torres from the competition. SAGAM also asserts that the cancellation decision violated various fairness provisions in the Federal Acquisition Regulation ("FAR"), codified in Title 48 of the Code of Federal Regulations.[3]

---

[2] SAGAM's allegations in this regard remain relevant to the court's review of the rationality of the agency's decision to cancel the solicitation.

[3] Although SAGAM also argues that the agency breached its duty of good faith and fair dealing in this procurement, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") recently held that the arbitrary and capricious standard of review for bid protests encompasses such a claim. See Safeguard Base Operations, LLC v. United States, 989 F.3d 1326, 1332 (Fed. Cir. 2021) ("[W]e . . . address a question of first impression—whether the Claims Court has jurisdiction over a claim that the Government breached an implied-in-fact contract to fairly and honestly consider an offeror's proposal in the procurement context."), 1343

Defendant contends that SAGAM's protest lacks merit and requests the entry of judgment in its favor.[4]  In addition, defendant argues for the first time in its reply brief that SAGAM's challenge to the issuance of a new solicitation is not ripe.  The latter argument must be rejected, for two reasons.

First, the argument is untimely.  SAGAM's objection to the issuance of a new solicitation by State, which is the necessary consequence of State cancelling the current solicitation, was squarely raised in SAGAM's opening brief.  The time for asserting any ripeness argument in opposition to this aspect of SAGAM's protest was when defendant filed its cross-motion for judgment on the administrative record.  Because defendant's ripeness argument was first raised in a reply brief, it is waived and will not be considered by the court.  See, e.g., Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (treating an argument raised for the first time in a reply brief as waived).

Second, there is no ripeness problem here.  State's issuance of a new solicitation is part and parcel of its cancellation of the tainted solicitation.  In the letters announcing the cancellation of the tainted solicitation, State informed both Torres and SAGAM that a new solicitation would issue "in the near future."  AR 2390-91.  This proposed agency action, cancellation combined with the issuance of a new solicitation, is ripe and subject to protest.  See, e.g., Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) ("This court has made clear that bid protest jurisdiction arises when an agency decides to take corrective action even when such action is not fully implemented.").  Even if defendant's ripeness argument were not waived the court would necessarily reject it.

The principal question before the court, then, is a narrow one:  Was State's decision to cancel the tainted solicitation and issue a new solicitation for the requirement rational in light of the CO's PIA violation?  The court first examines the error that provoked the agency's cancellation decision.

### 1. The CO's Disclosure of SAGAM's Proposal Information Was Improper

It is undisputed that the CO erred when she shared elements of SAGAM's proposal with

---

("[W]e adopt the traditional standards of review applicable in other bid protest cases brought under § 1491(b)(1)[, and not the standards of review applicable in cases brought under § 1491(a),] to bid protest[] cases which also raise implied-in-fact contract claims in the procurement context.").  For this reason the court will not separately address SAGAM's arguments alleging a breach of the agency's duty of good faith and fair dealing.

[4]  Defendant does not challenge SAGAM's standing to bring this suit.  SAGAM is an interested party with standing to bring this protest under either of the preaward standing tests articulated by the Federal Circuit.  See Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348-49 (Fed. Cir. 2013) (holding that the standing test varies depending on the type of preaward protest at issue).

Torres so that Torres could improve its proposal.[5]  See Def.'s Cross-Mot. 1 ("There is no dispute about the fact that the contracting officer made a mistake during the course of the procurement, and that corrective action is appropriate."), 31 (stating that the CO's November 2020 report "described errors by the contracting officer during the price evaluation in the last months of 2019"), 32 (stating that the CO "supplied SAGAM's proposal information to Torres"), 34 (noting that the CO's November 2020 report "described a disclosure of proposal information by the contracting officer").  State acknowledged in its communication to SAGAM that the disclosure was a PIA violation, and the CO has since acknowledged in this litigation that her disclosure of SAGAM's proposal information to Torres was a PIA violation.  Def.'s Suppl. Br. Ex. 1.  Nevertheless, defendant resists such a characterization and instead argues that it is "perhaps a close question" whether the CO did, indeed, violate the PIA.  Def.'s Cross-Mot. 27.

The PIA provisions that forbid a disclosure of the type made here are found at 41 U.S.C. §§ 2101(2), 2102(a).  Simply put, according to these provisions, a procurement official may not disclose one bidder's competition-sensitive proposal features, as enumerated in section 2101(2), to a competing bidder in an ongoing procurement.  See, e.g., FAR 3.104-3 (stating that a contracting officer "must not, other than as provided by law, knowingly disclose contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates"); Lion Vallen, Inc., B-418503 et al., 2020 WL 3542208 (Comp. Gen. May 29, 2020) ("The disclosure of proprietary or source selection information to an unauthorized person during the course of a procurement is improper.").  Defendant nonetheless suggests that SAGAM's proposal information, disclosed by the CO to Torres, does not meet the definition of "proposal information" protected by the PIA.  The court disagrees.

The information in SAGAM's proposal that was passed by the CO to Torres related to the exigencies of complying with local labor laws and labor agreements in Senegal and set forth SAGAM's understanding of those local conditions.  This understanding was essential to SAGAM's plan for the compensation and benefits that would be provided to its guard force.  To imply, as defendant does here, that SAGAM's compilation of pertinent local information had no protection under the PIA because the laws and agreements cited by SAGAM were publicly available is unsupportable.

Defendant acknowledges that the disclosed information regarding local conditions was lifted directly from "footnotes to [a] detailed chart" in SAGAM's proposal.  Def.'s Cross-Mot. 26-27 (comparing pages 1467-70 and 2018-19 of the administrative record).  The chart included citations to provisions of laws and labor agreements to explain specific cost categories in SAGAM's proposal, so as to provide State with the rationale for the costs of contract performance proposed by SAGAM.  See id. at 26 (characterizing the information taken from SAGAM's proposal as "cost categories based upon Senegalese statutes and public labor agreements").  The information conveyed by the CO to Torres was not simply a general reference to publicly available laws and labor agreements–each of SAGAM's citations to these

_____

[5] Her intent in sharing information gleaned from SAGAM's proposal with Torres is not relevant to the instant protest, but the error was egregious.

laws and agreements was linked to specific aspects of contract performance and contract costs.[6]

The information disclosed to Torres by the CO is encompassed within the definition of "Cost or pricing data" that is prohibited from disclosure under the PIA.[7] 41 U.S.C. § 2101(2)(A); see also id. § 3501(a)(1) ("The term 'cost or pricing data' means all facts that, as of the date of agreement on the price of a contract . . . , a prudent buyer or seller would reasonably expect to affect price negotiations significantly."). Because the information passed by the CO to Torres was cost data protected by the PIA, id. § 2101(2)(A), the court need not decide whether this information might also be protected as "proprietary information" under the PIA, id. § 2101(2)(C). The CO in this procurement clearly violated the PIA through her improper disclosure of SAGAM's proposal information to Torres.

Furthermore, it is not just the PIA that was violated by the CO.  SAGAM points to three fundamental fairness provisions of the FAR that also safeguard the integrity of federal procurement activities–FAR 1.102-2, FAR 1.602-2, and FAR 3.101-1.[8]  FAR 1.102-2(c)(3) states that "[a]ll contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same."  FAR 1.602-2(b) states that contracting officers shall "[e]nsure that contractors receive impartial, fair, and equitable treatment."  FAR 3.101-1 states that "[g]overnment business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none." Pursuant to any and all of these measures, a CO may not disclose the cost data of one offeror to the offeror's sole competitor in a procurement so that the competitor may appropriate the information.  Cf. MORI Assocs., Inc. v. United States, 102 Fed. Cl. 503, 511-13, 523-25 (2011) (noting that the fairness provisions of the FAR are implicated where there is evidence that an agency official violated the PIA to favor a particular offeror); Comput. Tech. Assocs., Inc., B-288622, 2001 CPD ¶ 187 (Comp. Gen. Nov. 7, 2001) (noting, in the context of a PIA violation, that FAR 1.602-2 authorizes a contracting officer to "protect the integrity of the procurement system by disqualifying an offeror from the competition"); Litton Sys., Inc., 68

---

[6] Defendant does not allege that SAGAM's explanatory footnotes linking local labor laws and labor agreements to the cost categories in its proposal had "been previously made available to the public or disclosed publicly," FAR 3.104-1, so as to remove this information from the protection of the PIA.

[7] As defendant's counsel noted at oral argument, the parties did not reference cost data, a category of proposal information protected by the PIA, 41 U.S.C. § 2101(2)(A), in their briefs. Although the disclosure of publicly available cost or price information causes no competitive harm, see Liquidity Servs., Inc., B-409718, 2014 CPD ¶ 221 (Comp. Gen. July 23, 2014) (finding no competitive harm where a rival offeror may have had access to the protestor's prices on a prior contract), SAGAM's application of relevant provisions of law and labor agreements to its guard compensation cost categories was competition-sensitive information, cf. Lion Vallen, Inc., 2020 WL 3542208, at *7 (noting that the agency acknowledged that the disclosure of the protestor's overall price to another offeror "affected the competition").

[8] These regulations are referenced by SAGAM in its critique of the agency's cancellation decision, not in the context of the CO's improper disclosures to Torres.

Comp. Gen. 422, 425 (May 12, 1989) (recommending that "the integrity of the [procurement] system would be best served by a termination of the [awardee's] contract" because of evidence that an agency official had passed to the awardee nonpublic information regarding technology developed by its only competitor). The court finds that the CO also violated FAR 1.102-2, FAR 1.602-2, and FAR 3.101-1, not just the PIA, when she disclosed SAGAM's proposal information to Torres.

The court next reviews the agency's proposed corrective action of cancelling the tainted solicitation and issuing a new solicitation.

### 2. Torres Must Be Disqualified to Rationally Address the CO's Improper Disclosure

State acknowledged in late 2020 that the PIA had been violated and that the procurement had been impacted. According to defendant, at that point the agency had discretion to cancel the solicitation and SAGAM's protest is "mere disagreement with the scope of the agency's corrective action." Def.'s Cross-Mot. 32. The fundamental flaw with defendant's position is that cancellation does nothing to remedy the improper disclosure to Torres–cancellation of the solicitation followed by the issuance of a new solicitation, as is contemplated here, merely perpetuates the agency's procurement error so that Torres can continue to benefit from the CO's unfairness to SAGAM and her violation of the PIA.

The nature of this court's review of challenges to an agency's corrective action was examined in Dell Federal Systems, L.P. v. United States ("Dell Federal"), 906 F.3d 982 (Fed. Cir. 2018). As is relevant here, the "'court may set aside a procurement action,' such as a corrective action, 'if . . . the procurement official's decision lacked a rational basis.'" Id. at 990 (quoting Centech Grp., 554 F.3d at 1037). The Federal Circuit also stated that "corrective action only requires a rational basis for its implementation." Id. at 991. In other words, the rational basis review for agency corrective actions is "highly deferential," id. at 992 (quoting Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir. 2013)), and is satisfied if the agency "provided a coherent and reasonable explanation of its exercise of discretion," id. (quoting Banknote, 365 F.3d at 1351). Applying this standard, the court considers the parties' arguments as to the rationality of State's cancellation decision.

As a threshold matter, SAGAM argues that the administrative record of this case does not contain an adequate explanation of the rationale behind State's decision to cancel the solicitation and not to disqualify Torres. See Pl.'s Mem. 27 ("Without any supporting rationale for choosing cancellation as the most appropriate remedy for its PIA violation, the Court is left without any basis against which to judge the rationality of that decision, in light of the other options available to the Agency." (emphasis added) (citing Starry Assocs., Inc. v. United States, 127 Fed. Cl. 539, 550 (2016))). The burden on State to explain its cancellation decision is not as onerous as SAGAM suggests, however.

Defendant argues that State "has no obligation to explain why it did not take some other corrective action that a protester believes would have been a better corrective action." Def.'s Cross-Mot. 33 (citing Dell Federal, 906 F.3d at 991-93). The Supreme Court of the United States, in defining the arbitrary and capricious standard of review of agency action, stated that a

court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974). More specifically, in Dell Federal, the Federal Circuit held that the procuring agency "was not legally required to address every [corrective action] option, but rather to provide a reasonable corrective action and adequately explain its reasoning for doing so." 906 F.3d at 998. Here, then, the burden on State is to provide a record of the rationale for the cancellation decision, so that the court may determine if this record provides "a coherent and reasonable explanation of [State's] exercise of discretion." Banknote, 365 F.3d at 1351.

The administrative record reflects that the HCA received a detailed account of the PIA violation that marred this procurement. It is clear that the CO believed that she could not "mitigate the PIA violation" and also believed that the proper corrective action was to "cancel and re-solicit the requirement." AR 2891. The HCA agreed with her assessment and her proposed course of action. As State reported to the GAO, the HCA determined that "the solicitation should be cancelled and the requirement re-solicited at a later date." Id. at 2407. The record before the court is adequate to decide whether the agency's corrective action survives rational basis review.

As the court undertakes its review of the record it is important to note that the facts here are unusual–the CO and State acknowledged that a PIA violation occurred but failed to take steps which would restore fairness to this procurement. The court understands that most contracting officers safeguard the proposal information sent to them by offerors and work diligently to prevent, rather than to initiate, inappropriate disclosures of this information. In addition, the court recognizes that most procuring agencies take steps to remedy a PIA violation, once the facts of the violation come to light, instead of ignoring the harm the PIA violation caused. Given that the agency in this procurement is so out of step with the norm, analogous bid protests are few. Before turning to precedent, the court considers the parties' perspectives on the effect that cancellation and resolicitation would have on SAGAM, Torres, and the agency, and whether in light of those effects the cancellation decision was rational.

Defendant musters very little logical support for State's decision to cancel the solicitation, other than to note that the FAR authorizes that type of corrective action, among others, after a PIA violation has occurred. See Def.'s Cross-Mot. 28 ("One remedy available to the HCA is to cancel the procurement." (citing FAR 3.104-7(d)(1)(i))). Indeed, defendant's cross-motion for judgment on the administrative record is devoid of any substantive argument as to the reasonableness of the corrective action chosen by State. Instead, defendant relies on the CO's PIA violation report to imply that it was not reasonable to allow the award to Torres to stand, see id. at 32 (noting "the uncertainty about the propriety of the award to Torres"), and to imply that it was not reasonable to proceed with the reevaluation of proposals, as State had planned for its first corrective action, because the PIA violation had an impact on the competition, id. at 27 ("In this case, the contracting officer's determination that a potential [PIA] violation did have an impact upon the procurement was not arbitrary." (citing AR 2385-86)). Defendant's reliance on the CO's report does not address whether the cancellation decision, under these circumstances, was a "reasonable corrective action," as required by Dell Federal, 906 F.3d at 998, and does not address the effect of the cancellation on the fairness of any competition under a new solicitation.

The only fairness concern raised in defendant's motion is that of the fairness of the disqualification of Torres proposed by SAGAM.  This passage is indicative of defendant's concern:

>     The [CO's] report did not suggest that Torres did anything wrong, or even that Torres knew that the discussion letter contained SAGAM['s] proposal information.  The December discussion letter from the contracting officer to Torres did <u>not</u> tell Torres that the checklist of cost categories had been gathered from the SAGAM proposal.

Def.'s Cross-Mot. 32 (citing AR 2018-21, 2385-86).  In addition, the fact that Torres benefited from a PIA violation, but did not plot to obtain SAGAM's proposal information, is emphasized in another passage of defendant's motion:

>     [T]he information provided to the HCA in this case made clear that Torres had not committed any violation of the PIA, or otherwise behaved improperly.  The [CO's] report described a disclosure of proposal information by the contracting officer; Torres played no role is seeking the disclosure.  The only action taken by Torres in connection with the disclosure letter was to respond to questions posed by the contracting officer.  Responding to the contracting officer's questions was proper behavior.

<u>Id.</u> at 34 (citing AR 2385-86); <u>see also</u> Def.'s Reply 6 (asserting that "Torres had done nothing wrong").  Nowhere, however, does defendant address the fairness of the cancellation from the standpoint of SAGAM, the victim of the CO's PIA violation.  In this regard, the CO's disregard of the fundamental fairness principles of the FAR is echoed in defendant's motion.

In its reply brief, in passing, defendant notes SAGAM's argument that SAGAM "will suffer a competitive harm in a subsequent procurement if Torres is allowed to offer a new proposal with labor rates and fringe benefit rates that comply with Seneg[a]lese law."  Def.'s Reply 6-7.  That passing mention of the competitive harm alleged by SAGAM is not given any weight in defendant's legal analysis.  Instead, defendant minimizes fairness concerns by asserting that "SAGAM wildly exaggerates the significance of the proposal information disclosed in the previous (now cancelled) procurement."  <u>Id.</u> at 14.

Finally, defendant rests on the assertion that "we have demonstrated in our moving brief that the State Department articulated a rational basis for its corrective action."  <u>Id.</u> at 11 (citing Def.'s Cross-Mot. 26-33).  But, as noted above, beyond the fact that cancellation is permitted by FAR 3.104-7(d)(1)(i), the referenced sections of defendant's motion do not show that the cancellation decision was reasonable–they merely show that the CO proposed cancellation because the PIA violation could not, in her opinion, be mitigated.

It may be that defendant's misapprehension of the persuasiveness of its rational basis contentions is founded on a skewed interpretation of <u>Dell Federal</u>.  As part of defendant's critique of SAGAM's interpretation of the standard of review stated in <u>Dell Federal</u>, defendant

chides SAGAM for including a requirement that the court go "beyond determining whether there is a rational relationship between a defect in the procurement and the corrective action." Def.'s Reply 9. Although the Federal Circuit in Dell Federal endorsed the agency's corrective action and noted that it was "rationally related" to the procurement's defects, 906 F.3d at 995, this turn of phrase does not fully capture the essence of the Federal Circuit's rational basis review of the procurement at issue.

In Dell Federal, two procurement errors were addressed by the agency's corrective action: "failure to conduct discussions and spreadsheet ambiguities." Id. The agency's corrective action survived rational basis review because both defects were remedied. First, the Federal Circuit noted that "the only way to conduct discussions as contemplated here is to reopen the procurement process to solicit revised proposals," id., which is exactly what the agency proposed to do with its corrective action, id. at 988. Second, the spreadsheet ambiguities were "material" and could not be corrected through clarifications, so the ambiguities would be addressed in discussions the agency would hold with the offerors. Id. at 995. Thus, because the agency's corrective action was "rationally related" to the defects it addressed, it was reasonable and survived rational basis review. Id.

If defendant were correct that any rational relationship, no matter how tenuous, between a procurement defect and the agency's corrective action suffices, the requirement that the agency initiate a "reasonable corrective action," Dell Federal, 906 F.3d at 998, is cast aside. Under defendant's rational relationship construct, it appears that the CO could cancel the solicitation merely because (a) she committed a PIA violation, and (b) there is a rational relationship in the FAR between PIA violations and solicitation cancellations. But that is not the standard that the Federal Circuit set forth in Dell Federal, as shown by its application of the standard to the facts of that bid protest, and by its invocation of precedent.

The Federal Circuit requires, under the rational basis standard, that an agency's corrective action be "rationally based and not contrary to law." Croman Corp., 724 F.3d at 1367; see also Raytheon Co. v. United States, 809 F.3d 590, 595 (Fed. Cir. 2015) (inquiring whether the grounds for the challenged corrective action were "rationally justified"); Chapman L. Firm Co., 490 F.3d at 938 (affirming "this court's inquiry into the reasonableness of the Government's . . . proposed corrective action"). As this precedent was interpreted in Dell Federal, the corrective action must have a rational basis, or, in other words, it must be a "reasonable corrective action." 906 F.3d at 998. This is a very deferential standard, but it is nonetheless more stringent than the carte blanche for State that defendant appears to propose.

In contrast to defendant, SAGAM thoroughly examines the effect of the cancellation and new solicitation, as well as the rationality of State's corrective action. SAGAM asserts that the CO's PIA violation "allowed Torres to correct its defective compensation plan," and cancellation of the solicitation "does nothing to reasonably address the fact that Torres will simply prepare a new bid proposal" using the information taken from SAGAM's proposal that was improperly disclosed to Torres by the CO. Pl.'s Mem. 28, 30. In SAGAM's view, any reasonable corrective action must remove the "taint" of the PIA violation from State's procurement of the contract requirement. Id. at 30 (citing NKF Eng'g, Inc. v. United States, 805 F.2d 372, 376-77 (Fed. Cir. 1986)). Although defendant may quibble with SAGAM's characterization of the nature and

importance of the improperly disclosed cost and pricing data, the court agrees with SAGAM that the integrity of this procurement was tainted, and that any reasonable corrective action was required to address, in some substantive way, the fact that Torres now possesses competition-sensitive information that it has no right to possess.  See id. at 2-3 ("[T]he only effective way to remove the taint . . . is to disqualify Torres and proceed to award under the current Solicitation or to disqualify Torres from participating in the planned resolicitation . . . .").

As for the parties' dispute over the proper standard of review, SAGAM correctly notes that it is arbitrary and capricious for an agency to have "entirely failed to consider an important aspect of the problem," Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43; the important aspects of the problem in this case are that State tainted the integrity of this procurement and that Torres possesses information that gives it an unfair advantage.  This is not a protest foreclosed by Dell Federal, as defendant insists, in which a protestor challenges a corrective action for not being the most advantageous choice of a remedy for a procurement defect.  Here, SAGAM rightly attacks the cancellation decision as ignoring the most significant aspect of the CO's PIA violation–that Torres now possesses improperly disclosed information that it can use again, unfairly, to obtain the contract award.  The court therefore agrees with SAGAM that the cancellation decision lacks a rational basis, as does State's plan to resolicit the requirement.[9]

Other bid protest decisions supply guidance in this case, starting with binding precedent that provides an overview of the tools that might be used to ensure procurement integrity.  It is clear that a contracting officer has broad authority to protect the integrity of the procurement process, including the authority to disqualify an offeror based on an impropriety or an appearance of impropriety in the procurement.  NKF Eng'g, 805 F.2d at 377 & n.7.  This authority to disqualify offerors is explicitly authorized, in the context of PIA violations, by FAR 3.104-7(d)(1)(ii).  The contracting officer's power to disqualify offerors so as to cure an appearance of impropriety must yield, however, to statutory mandates requiring the public release of information held by government agencies.  R & W Flammann GmbH v. United States, 339 F.3d 1320, 1324 (Fed. Cir. 2003).  Finally, in the procurement integrity context, a contracting officer may not disqualify an offeror in the absence of facts showing that an impropriety or an appearance of impropriety occurred.  See NKF Eng'g, 805 F.2d at 376 (interpreting the holding of CACI, Inc.-Fed. v. United States, 719 F.2d 1567 (Fed. Cir. 1983)).

The parties unearthed a body of nonbinding precedent that touches upon the issue of the reasonableness of corrective actions that address procurement improprieties.  These decisions are largely unhelpful due to the unusual facts of this case.  It is ironic that defendant chides SAGAM for failing to find analogous cases, when it was the CO's behavior in this procurement that stepped so far out of the normal course of a procuring agency's communications with offerors.  See Def.'s Cross-Mot. 34 ("In its brief, SAGAM cites no case holding that an offeror should be disqualified based upon a PIA violation, or other misconduct, committed by someone else."), 36 (asserting that SAGAM's proposal that State disqualify Torres is made "without citing any legal authority"); Def.'s Reply 12 ("SAGAM fails to cite a single decision where an offeror was disqualified merely because that offeror possessed proposal information from a prior

---

[9]  Torres was invited by State to compete for the contract requirement under the new solicitation.  AR 2391.

procurement."). Notwithstanding the paucity of bid protests that resemble this one, persuasive authority and common sense compel the conclusion that State's cancellation decision was not a rationally related response to the procurement defect that left Torres in possession of SAGAM's competition-sensitive information.

The court begins with Lion Vallen, Inc., a recent decision issued by the GAO. 2020 WL 3542208. According to the agency's contracting officer, an inadvertent disclosure of one offeror's "price and other source selection information" to another offeror, during discussions, "incurably affect[ed] the source selection process," so the contracting officer "recommended cancelling the procurement." Id. at *3. After the cancellation, the agency issued a new solicitation. Id. at *4. The offeror that had been notified of the disclosure of its proposal information protested the agency's new solicitation, arguing, in relevant part, that "the agency improperly disclosed the protester's proprietary information on three occasions and failed to adequately mitigate the competitive disadvantage from the disclosures." Id. at *5.

The GAO found that there was no competitive disadvantage flowing from the disclosure of the protestor's technical information, and that the agency had sufficiently mitigated the impact on the procurement of the disclosure of protestor's price information. As to the first type of disclosure, the protestor failed to show how the technical information, which identified flaws in the protestor's proposed approach to contract performance, would provide a competitive advantage to its rivals in the new competition. For the second type of information, the disclosure of the protestor's overall price for the cancelled solicitation was benign due to substantive changes in the contract requirements and labor categories set forth in the new solicitation.

Although the agency's corrective action, including the issuance of a new solicitation, was deemed to be reasonable in Lion Vallen, Inc., the facts here are distinguishable. SAGAM has shown that it has and will continue to suffer a competitive disadvantage because Torres now benefits from improperly disclosed proposal information. Cancellation and resolicitation do not reasonably address the CO's inequitable conduct here.

An instructive example of the disqualification of an offeror is found in Computer Technology Associates, a 2001 decision by the GAO. 2001 CPD ¶ 187. Employees of the protestor improperly obtained and studied information presented orally by other offerors to agency staff, and the protestor was disqualified from the competition. The GAO upheld the disqualification, noting that the protestor "obtain[ed] and possess[ed] the information, and . . . was in control of whether it was used, [which] calls into question the integrity of the immediate and future source selections." Id. The primary similarity between Computer Technology Associates and this case is that Torres continues to possess the improperly disclosed information taken from SAGAM's proposal, which affects the integrity of the current competition as well as a future competition. The primary difference, and it is a significant one, between Computer Technology Associates and this case is that Torres did not steal the competition-sensitive information–it was given the information by the CO.[10] But see Compliance Corp. v. United

_____

[10] Although this type of PIA violation appears to be rare, the knowing disclosure of proposal information submitted by one offeror to persons not permitted to view such material has been the topic of other protests. See, e.g., Litton Sys., Inc., 68 Comp. Gen. at 422 (sustaining a

States, 22 Cl. Ct. 193, 201 (1990) ("Even assuming the conduct itself was devoid of improper motives, what remains is the appearance of impropriety, which is a proper basis for disqualification." (citing NKF Eng'g, 805 F.2d at 376-77)), aff'd, 960 F.2d 157 (Fed. Cir. 1992).

A logical corrective action protest to discuss here is the one the GAO flagged as raising issues similar to those in SAGAM's GAO protest of State's cancellation decision, Superlative Technologies, Inc. ("Superlative II"), B-310489.4, 2008 CPD ¶ 123 (Comp. Gen. June 3, 2008). That decision was preceded by an earlier one, Superlative Technologies, Inc. ("Superlative I"), B-310489 et al., 2008 CPD ¶ 12 (Comp. Gen. Jan. 4, 2008), which provides useful context.  As described in Superlative I, Superlative Technologies, Inc. ("SuperTec") was one of three offerors in a negotiated procurement.  An agency representative reported to the contracting hierarchy that she had compromised the integrity of the procurement by sharing confidential source-selection information with two of the offerors, but not with SuperTec.  Superlative I, 2008 CPD ¶ 12.  The contracting officer cancelled the "tainted procurement."  Id.

Unfortunately, the new solicitation, through various improper machinations, resulted in a sole-source contract award to a team including one of the offerors that had received the improperly disclosed information, and the proposal that the team submitted for the sole-source award was substantially the same as the earlier one submitted by the offeror with an "unfair advantage" in the first competition.  Id.  In other words, SuperTec lost its opportunity to fairly compete for the contract because the cancellation decision perpetuated the tainted procurement through a new solicitation that remained fundamentally unfair.  The GAO advised the agency to "rescind the cancellation notice" and "determin[e] what information was disclosed and to whom, [and whether one of the recipients of the improper disclosure] or any other offeror should be disqualified from the competition, and/or whether a level playing field can be established by disclosing the information [that was not disclosed to SuperTec] to all offerors."  Id.  Finally, the GAO recommended that "[f]ollowing that consideration, the agency should conduct a competitive procurement for the requirements under the original [request for quotations], if otherwise appropriate."  Id.

In Superlative II, 2008 CPD ¶ 123, the GAO assessed, in a new but related protest, whether the agency had followed through on its investigation of the tainted procurement and had reasonably resolved the procurement integrity violation.  It had not.  Indeed, there was no substantive investigation or consideration of procurement integrity; only when the GAO insisted on further investigation was the importance and extent of the improper communications revealed.  Id.  When the GAO warned the agency that SuperTec's new protest would also be sustained, in all likelihood, the agency refused to take action:  "Notwithstanding our specific advice, the agency ha[d] not indicated that it intends to take any further action with regard to these issues."  Id.

---

protest because evidence indicated "that, at a critical period in the competition, source selection sensitive information concerning Litton's product was improperly disclosed by the Air Force to" Litton's sole competitor).

After a lengthy analysis of a procuring agency's responsibilities under the fairness provisions of the FAR, the GAO stated that the agency's conduct "precludes a conclusion that the cancellation, followed by the subsequent sole-source award under which [the recipient of the improper information] is performing a substantial portion of the services sought under the canceled solicitation, was reasonable and appropriate." Id.  The GAO commented that the agency "fail[ed] to meaningfully address the FAR requirements regarding identification and resolution of procurement integrity and/or [organizational conflict of interest] issues.  On this record, the agency's actions are not reasonable, nor are they consistent with the FAR requirements." Id.  SuperTec's second protest was sustained, and the GAO again recommended that the agency investigate the procurement integrity violations and determine whether, among other options, disqualification of an offeror, or offerors, was appropriate.

Although the court agrees with defendant that Superlative II is distinguishable from this case on its facts, the operative issues are not dissimilar because in that procurement the agency, after giving an unfair advantage to two of three offerors, perpetuated the unfairness through cancellation of a solicitation and resolicitation.  The agency turned a blind eye to the fairness principles that require that all offerors be treated equitably.  Here, too, State takes an ostrich-like stance and refuses to reasonably address the taint caused by the CO's disclosures to Torres and the failure of cancellation and resolicitation to mitigate the CO's improper disclosures.

Disqualification is a tool that can level the competitive playing field.  See, e.g., Guardian Techs. Int'l, B-270213 et al., 96-1 CPD ¶ 104 (Comp. Gen. Feb. 20, 1996) ("A contracting officer may protect the integrity of the procurement system by disqualifying an offeror from the competition where the firm may have obtained an unfair competitive advantage, even if no actual impropriety can be shown, so long as the determination is based on facts and not mere innuendo or suspicion.").  And, although disqualification may seem like a severe sanction, at times it is the only remedy that can reasonably address a PIA violation.  See id. (stating that because "the evidence is sufficient to establish a strong likelihood that [an offeror] gained an unfair competitive advantage in this procurement," the agency should "disqualify [the offeror with the unfair advantage] from the competition" (citing NKF Eng'g, 805 F.2d at 372)).  Here, too, the only reasonable corrective action is to disqualify Torres from the current competition.

### 3.  SAGAM Has Established Prejudice

Although SAGAM has established that State's cancellation and resolicitation decision lacked a rational basis, SAGAM cannot prevail unless it demonstrates that it was prejudiced by that corrective action.[11]  Specifically, the burden on SAGAM is to show that absent the agency's decision, SAGAM had a substantial chance of receiving the contract award.  Banknote, 365 F.3d at 1351; Data Gen., 78 F.3d at 1562.  If, rather than cancelling the solicitation, the agency had crafted a rational corrective action and disqualified Torres from the competition under the tainted solicitation, SAGAM had a substantial chance of receiving the contract award because it was the only bidder, other than Torres, in the competitive range.  SAGAM was prejudiced by the corrective action instituted by State that lacked a rational basis.

---

[11]  Defendant did not address the issue of prejudice in either its cross-motion for judgment on the administrative record or its reply brief.

### 4.  Injunctive Relief Is Merited

Because SAGAM has established the existence of a significant, prejudicial procurement error, the court must address whether SAGAM is entitled to injunctive relief.  The United States Court of Federal Claims has the authority to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2), and is guided in making such an award by Rule 65 of the Rules of the United States Court of Federal Claims ("RCFC").  In determining whether to issue a permanent injunction, the court must consider whether (1) the plaintiff has succeeded on the merits; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief.  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

The protestor bears the burden of establishing the factors by a preponderance of the evidence.  Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 654 (2014).  None of the four factors, taken individually, is dispositive, and a "weakness of the showing regarding one factor may be overborne by the strength of the others."  FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).[12]  Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of injunctive relief.  Id.  The award of injunctive relief is within the discretion of the court.  See Turner Constr. Co. v. United States, 645 F.3d 1377, 1388 (Fed. Cir. 2011) ("We give deference to the Court of Federal Claims' decision to grant or deny injunctive relief, only disturbing its decision if it abused its discretion.").

SAGAM has succeeded on the merits of its protest.  Therefore, the court considers the three remaining injunctive relief factors.

### a.  Irreparable Injury

With respect to the irreparable injury factor, "[t]he relevant inquiry . . . is whether [the] plaintiff has an adequate remedy in the absence of an injunction."  Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993); see also Younger v. Harris, 401 U.S. 37, 43-44 (1971) (noting that "the basic doctrine of equity jurisprudence [is] that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief").  SAGAM contends that it will be harmed absent a permanent injunction because it will lose the ability to fairly compete for the contract, either through the tainted solicitation or a new solicitation.  SAGAM also states that resolicitation "would not only deprive SAGAM of a contract opportunity to continue providing local guard services as it has done successfully for more than 35 years, but also penalize SAGAM for the Agency's PIA violation." Pl.'s Reply 20.

---

[12]  Although FMC Corp. concerns the award of a preliminary injunction, 3 F.3d at 427, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success," Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987).

Defendant argues that monetary losses flowing from the inability to secure a contract and being subjected to unfair competitive bidding processes are not enough to show irreparable harm. Further, in defendant's view, because the record does not show that SAGAM's proprietary information was disclosed to Torres, SAGAM has not suffered irreparable harm. While any of these propositions might be debatable when viewed in isolation and in hypothetical circumstances, here there is no doubt that SAGAM has suffered irreparable harm due to the CO's improper disclosure of SAGAM's proposal information to its sole rival in the competitive range for this competition, and its likely rival in any subsequent competition.[13]

This court has recognized that a lost opportunity to compete for a contract–and the attendant inability to obtain the profits expected from the contract–can constitute irreparable injury. See, e.g., Serco Inc. v. United States, 81 Fed. Cl. 463, 501-02 (2008) (observing that when "the only other available relief–the potential for recovery of bid preparation costs–would not compensate [the protestors] for the loss of valuable business," such a "loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm"). As the long-term incumbent contractor, SAGAM submitted a proposal with the expectation of making a profit. The lost opportunity to fairly compete for this contract and earn profits, as evidenced by the declaration attached to SAGAM's supplemental brief, constitutes irreparable harm in this instance.[14]

Defendant contends, nonetheless, that because the terms of State's new solicitation are not yet known, SAGAM's allegations of irreparable harm are too speculative. To support this argument, defendant explores hypothetical scenarios: (1) "[I]t is possible that the new solicitation will identify all statutory labor benefit provisions in Senegal, or require all offerors to do so in their proposals, [so as to] put all offerors on an equal footing in a clear manner." (2) "[T]he new solicitation may contain objectionable terms, and SAGAM may protest the solicitation." Def.'s Suppl. Br. 5 n.2. The court does not find that these abstract scenarios diminish the irreparable harm flowing to SAGAM from the cancellation and resolicitation of the contract requirement. The agency's PIA violation, unmitigated by a rational corrective action, deprived SAGAM of a fair competition and the potential for profits from winning the contract, and will continue to affect SAGAM's ability to fairly compete for a new contract. Consequently, SAGAM has established irreparable injury.

### b. Balance of Hardships

In addition to considering whether a protestor would suffer an irreparable injury absent a permanent injunction, "the court must weigh the irreparable harm [the] plaintiff would suffer

---

[13] Defendant's reliance on Citizant, Inc. v. United States, No. 18-856, 2021 WL 2371709 (Fed. Cl. June 9, 2021), is inapt. In that opinion, there was no weighing of the irreparable harm factor to determine whether a permanent injunction should issue.

[14] The court ordered supplemental briefing because the parties' discussion of the irreparable harm and balance of hardships factors was not robust, and their positions on the feasibility of various specific proposals for injunctive relief were unclear. The supplemental briefing caused no delay.

without an injunction against the harm an injunction would inflict on defendant." Progressive Indus., Inc. v. United States, 129 Fed. Cl. 457, 485 (2016).  SAGAM contends that State will not be harmed because "SAGAM is the longtime incumbent and capable of continuing to perform under a new contract award, saving the Government from any time/cost associated with a recompete," Pl.'s Mem. 38, and notes that State has already deemed "SAGAM's proposal [to be] 'Acceptable,'" Pl.'s Reply 20.  Defendant asserts in its cross-motion for judgment on the administrative record that enjoining the cancellation of the solicitation and resolicitation of the contract requirement would "deny the United States the benefits of competition."  Def.'s Cross-Mot. 40.

SAGAM argues that the balance of hardships tips in its favor.  The court agrees.  As shown by the parties' arguments in their supplemental briefs, which are supported by declarations, the harm to SAGAM flowing from the absence of an injunction greatly outweighs the inconvenience that State would experience from an injunction that was necessitated by the CO's unmitigated PIA violation.  Indeed, to deny the injunction would reward the CO for her violation.

SAGAM highlights three specific consequences of the PIA violation, which was followed by cancellation and a proposed resolicitation of the requirement by State:  (1) Torres now possesses SAGAM's understanding of compensation requirements for guards in Senegal; (2) SAGAM lost the opportunity to fairly compete for up to five years of contract performance; and (3) SAGAM lost the opportunity to earn profits on that contract performance.  According to SAGAM, absent injunctive relief, such as the disqualification of Torres, these harms are ongoing.  Further, contends SAGAM, bid preparation and proposal costs would not make up for its losses, because only injunctive relief provides an adequate remedy.

Defendant recites a litany of hardships that the agency would face if this court issues an injunction.  In the agency's view, the following conditions, among others, should be considered by the court:  (1) resolicitation is urgently needed, given the passage of time, because the conditions in Senegal are not the same as those underlying the tainted solicitation; (2) the disqualification of Torres would be expensive for State, as SAGAM could "name its price," Def.'s Suppl. Br. 10; and (3) injunctive relief could lead to more protests, including one by Torres, potentially requiring that the agency resort to expensive sole-source contract solutions in 2022.  The court is mindful, too, that the safety of embassy personnel is of grave concern, and that national security, in general, is given "due regard" in this court's bid protest jurisdiction. See 28 U.S.C. § 1491(b)(3).

It is important to note, first, that State is responsible for the hardships it now faces, through its violation of the PIA and its failure to undertake a rational corrective action to redress that violation.  The court cannot ignore the fact that State's hardships are largely self-inflicted whereas SAGAM's hardships are the product of the agency's failure to conduct a fair procurement, or to ensure that a new procurement would be fair.  See, e.g., Anham FZCO v. United States, 144 Fed. Cl. 697, 724 (2019) ("The irreparable harm plaintiff would suffer absent an injunction weighs heavily against defendant's hardships that are, to some degree, of its own making.").  When the remarkable circumstances of this procurement are considered as a whole, additional procurement delays and costs pose less of a hardship to State than the hardship that

would be suffered by SAGAM.

### c. Public Interest

Finally, when "employing the extraordinary remedy of injunction," a court "should pay particular regard for the public consequences" of doing so. Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). There is no dispute that "[t]here is an overriding public interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement regulations." Bona Fide Conglomerate, Inc. v. United States, 96 Fed. Cl. 233, 242 (2010). Although "there is a countervailing public interest in minimizing disruption" to the procuring agency, Heritage of Am., LLC v. United States, 77 Fed. Cl. 66, 80 (2007), defendant has not persuaded the court that State's activities in Senegal would be disrupted by rectifying the CO's PIA violation. Rather, the United States might pay a premium for contract services provided by SAGAM, as contrasted with services provided by Torres, which is a reasonable price to pay to fulfill the agency's obligation to treat potential contractors fairly. While State's avowed interest in "truly full and open competition" is generally a high priority in procurement law, Def.'s Suppl. Br. 10, under the circumstances of this procurement the agency's interests in the benefits of price competition must yield to its duty to treat prospective contractors fairly, FAR 1.102-2(c)(3). Accordingly, the court finds that the public interest weighs in SAGAM's favor.

### 5. The Court Tailors Injunctive Relief to Minimize Harm

In addition to prevailing on the merits of its protest, SAGAM has established that it will suffer irreparable harm if the court withholds injunctive relief, that the balance of hardships tips in its favor, and that an award of injunctive relief is in the public interest. Thus, the issuance of a permanent injunction is warranted. In issuing a permanent injunction, this court tailors that relief so that any harm to the government, private parties, and the public interest is minimized. E.g., Heritage of Am., LLC, 77 Fed. Cl. at 79. Having considered the parties' recommendations as to the terms of a permanent injunction (all of which are unacceptable to the agency), the court imposes an injunction that will safeguard fundamental fairness principles.

At the outset, the court rejects defendant's favored choice among the actions proposed by the parties: there is no need to remand the agency's cancellation and resolicitation plan to the HCA to obtain a second opinion as to whether the plan is rational and whether the agency should reconsider its decision not to disqualify Torres. It is now time to fix the mess that State has made of this procurement, without further delay.

The only effective solution here is to restore this competition to its status before cancellation by enjoining the cancellation of the solicitation, enjoining any resolicitation of the requirement, disqualifying Torres as the beneficiary of improperly disclosed information taken from SAGAM's proposal, and having the agency proceed to award the contract to the only remaining offeror in the competitive range (i.e., SAGAM), if that offeror is found to be a responsible offeror. Cf. Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1154 (Fed. Cir. 1994) (holding that, in the context of an improper cancellation, the proper "injunctive remedy merely restores the status quo ante the illegal cancellation"). This solution is the only one that

cures the PIA violation and does not penalize SAGAM for the improper behavior of the CO.

Defendant argues, nonetheless, that the court does not have the power to compel the award of a contract to a particular offeror.  It is true that the "[s]election of a contractor among the [offerors] and award of the contract are improper exercises of the court's authority."  CCL Serv. Corp. v. United States, 43 Fed. Cl. 680, 688 (1999); see also Scanwell Lab'ys, Inc. v. Shaffer, 424 F.2d 859, 869 (D.C. Cir. 1970) ("It is indisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties.").  But here the court did not make a competitive range of one–that circumstance is the product of the agency's evaluation of SAGAM's and Torres's proposals and the contamination of this procurement by the CO.  The injunction in this matter bars the agency's cancellation of the solicitation and resolicitation, as both of these actions are arbitrary, capricious, and violate fairness standards, and requires the government to "eliminate the . . . taint of the prior proceedings." CACI, Inc.-Fed., 719 F.2d at 1575.  The court does not thereby make a contract between State and SAGAM, it instead requires State to implement its only remaining lawful option in this procurement.  See Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 371 (2004) (enjoining the agency in that protest "from proceeding with performance of the contract with any entity other than [the protestor] provided that the Corps finds [the protestor] to be a responsible contractor").

This court has enjoined the improper cancellation of a solicitation on other occasions.  E.g., Tolliver Grp., Inc. v. United States, 151 Fed. Cl. 70, 120 (2020).  In rare circumstances, this type of injunction leaves the agency with only one lawful option, award to the protestor.  The following passage from Parcel 49C discusses the effect of an injunction that was not very different from the injunction required here:

> In this case, . . . the trial court did not order the award of the contract to Parcel 49C.  Instead, the trial court properly enjoined the illegal action and returned the contract award process to the status quo ante any illegality.  Before the illegal cancellation, [the General Services Administration] had announced the intended award to Parcel 49C.  The court's injunction, however, does not order the award of the contract to Parcel 49C.  The court's order merely restores the posture of the process before the illegal cancellation. The award process is not complete.  The process will commence from where it left off with the contract award flowing from an orderly and lawful proceeding.  The Court of Federal Claims' injunction has the effect of returning [the solicitation] to its pre-cancellation posture and removing the illegal taint.

31 F.3d at1153 (emphasis added).  In that protest, "[t]he Government retain[ed] the power to proceed with its award process or to terminate the award process for any legal reason."  Id. at 1154 (emphasis added).  Here, State has the discretion to terminate the award process if SAGAM is not a responsible offeror, but there are no other lawful reasons that permit State to avoid an award to SAGAM.

Defendant also argues that the disqualification of Torres is beyond the power of the court, relying on Axiom Resource Management, Inc. v. United States, 564 F.3d 1374 (Fed. Cir. 2009).

-21-

According to defendant, this court would "step into the shoes of the contracting officer" were it to disqualify Torres from the competition.  Def.'s Supp. Br. 12 (citing Axiom, 564 F.3d at 1381-82).  The referenced passage from Axiom, however, criticizes the trial court for conducting a de novo review of potential organizational conflicts of interests, instead of reviewing the record of the procuring agency's conduct under the arbitrary and capricious standard.  Here, State's failure to disqualify Torres after the discovery of the CO's PIA violation was arbitrary, capricious, and fundamentally unfair in contravention of the FAR.  In directing the agency to disqualify Torres, the court has adhered to the standard of review in both Axiom and Dell Federal.

Finally, defendant raises concerns that the contract award to SAGAM will pose a number of risks for State and even for SAGAM.  Having duly considered these concerns, the court notes that the difference between SAGAM performing extensions of the incumbent contract through March 31, 2022, and performing the base year of a new contract, which includes four option years, through the summer of 2022, does not appear to have much impact on the risks identified in the CO's declaration.  The court is not persuaded that the risks identified by the CO, in these circumstances, outweigh the importance of the permanent injunction in favor of SAGAM.

## III.  CONCLUSION

For the reasons set forth above, the court **GRANTS** defendant's motion to dismiss Count II of the complaint on mootness grounds, **GRANTS** SAGAM's motion for judgment on the administrative record, and **DENIES** defendant's cross-motion for judgment on the administrative record.  SAGAM is entitled to injunctive relief.  Specifically, the court **DIRECTS** State to restore this competition to its status precancellation, **ENJOINS** State from cancelling Solicitation No. 19AQMM18R0332 and from resoliciting the contract requirement, **DIRECTS** State to disqualify Torres as the beneficiary of improperly disclosed information taken from SAGAM's proposal, and **DIRECTS** State to proceed to award the contract to the remaining offeror in the competitive range if that offeror is determined to be responsible.

Further, the court awards costs to SAGAM pursuant to RCFC 54(d).  The clerk shall enter judgment in favor of SAGAM, consistent with this opinion.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Friday, July 23, 2021**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.[15]

Further, the court reminds the parties of their obligation under paragraph 12 of the protective order filed on March 31, 2021, to file redacted versions of protected documents for the public record.  If the parties have not already filed redacted versions of their motions and

---

[15]  The parties' status report shall also identify proposed redactions, if any are required, to the court's order of June 11, 2021, which was filed under seal.

supporting briefs, they shall file a joint status report **by no later than Friday, July 23, 2021**, explaining the reason for the delay.

       **IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge
